Christine Wilcox v. SSA            CV-03-408-PB  07/28/04

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Christine Wilcox**

    **v.**                                        Civil No. 03-408-PB
                                              Opinion No. 2004 DNH 115

**Jo Anne Barnhart, Commissioner,**
**Social Security Administration**


### MEMORANDUM AND ORDER

On January 30, 2002, Christine Wilcox filed an application with the Social Security Administration ("SSA") for disability insurance benefits ("DIB").  In her application for DIB, Wilcox alleged that she had been unable to work since December 20, 2000. The SSA denied her application and granted her request for a hearing by an Administrative Law Judge ("ALJ").  On January 22, 2003, ALJ Frederick Harap held a hearing and in an opinion dated April 23, 2003, denied Wilcox's request for DIB.  Wilcox appealed, but the Office of Hearings and Appeals denied her request for review of the ALJ's decision.  At that point, the decision of the ALJ became the final decision of the Commissioner of Social Security ("Commissioner").

Wilcox brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act seeking review of the denial of her application for benefits. She argues that the ALJ failed to identify, inquire into, or resolve conflicts between the vocational expert's ("VE") testimony and the listing in the Dictionary of Occupational Titles ("DOT"), and that the ALJ failed to properly consider the effect of her subjective complaints of pain on her ability to work. For the reasons set forth below, I conclude that the ALJ's decision is supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Wilcox's motion to reverse.

## I.  BACKGROUND[1]

### A.  Education and Work History

Christine Wilcox was 44 years old when her application for DIB was denied by the ALJ in April 2003. She has an eighth grade education and has worked as a factory machine operator, cashier, dishwasher, and most recently as a factory operator and

---

[1] Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts (Doc. no. 10) submitted by the parties.

assembler.

## B.  Medical History

Wilcox performed hand assembly work and repetitive motion assembly at her last job.  Over time she developed pain and numbness in her right hand along with tingling sensations in several of her right fingers.  Wilcox sought assistance from her primary care physician, Dr. Amy Schneider, who prescribed anti-inflammatory medications and a number of different splints during their meeting on November 20, 2000.[2]  After two more appointments, and worsening pain and numbness, Dr. Schneider gave Wilcox a no-work note on December 20, 2000.  Physical therapy proved to be unsuccessful and on January 9, 2001, Schneider referred Wilcox to Dr. Jeffrey Clingman, an orthopedic surgeon. Dr. Clingman diagnosed Wilcox with right carpel tunnel syndrome and on January 29, 2001 performed right carpel tunnel release surgery on Wilcox.  After surgery, Wilcox returned to physical

---

[2] Dr. Schneider initially prescribed Ultram Tabs (50 Mg.)(centrally acting analgesic, generically known as Tramadol HCL) and Amitriptyline HCL Tabs (25 Mg.)(antidepressant/sedative) originally.  In subsequent visits, she prescribed Ibuprofen Tabs (800 Mg.)(nonsteroidal anti-inflammatory) and Relafen Tabs (750 Mg.)(nonsteroidal anti-inflammatory, generically known as nabumetone).  Dorland's Illustrated Medical Dictionary, 1934, 63, 903, 1219 (30th ed. 2003).

therapy for a strengthening program but pain and numbness continued despite her good progress in grip and pinch strength.

Dr. Clingman referred Wilcox to Dr. Christopher Martino, a neurologist, to undergo nerve conduction studies. Dr. Martino performed an EMG on May 11, 2001, and found that Wilcox had a mild compromise at the median nerve in her right hand and diminished sensory functions. After an MRI on May 21, 2001, Dr. Clingman concluded that Wilcox had an entrapped nerve and that her options were to have a revision carpel tunnel release or to do nothing. Wilcox decided against the re-release and consulted Dr. Gary Woods, a hand specialist, for a second opinion. Dr. Woods found the MRI to be consistent with continued nerve entrapment and offered to re-explore the area, but Wilcox declined.

On August 27, 2002, Wilcox met again with Dr. Clingman complaining of carpel tunnel syndrome on the left side. Dr. Clingman then referred Wilcox back to Dr. Martino for further nerve test studies. On October 16, 2001, Dr. Martino again performed an EMG test and found evidence of a left-side medium nerve compression at the wrist. Shortly after, on November 7, 2001, Wilcox met with Dr. Arnold Miller for an independent

medical evaluation. Dr. Miller recommended that Wilcox be retrained for light-duty work that did not require repetitive motion with the right hand or wrist. Wilcox underwent left carpel tunnel release surgery on December 3, 2001. Wilcox was again referred to occupational therapy following her surgery but despite improved progress with grip strength, she continued to have numbness in some of her fingers.

On April 1 and 2, 2002, Wilcox participated in a Work Capacity Evaluation that was supervised by occupational therapist Joyce Sylvester. After assessing all 20 physical demands listed in the DOT, Sylvester concluded that Wilcox was best suited for sedentary work. Overall, Sylvester found that Wilcox had no trouble sitting, standing, or walking, but that she should avoid tasks that demand dexterity. Finally, Sylvester found that Wilcox could perform tasks that involved brief periods of writing and lifting, and that she would benefit from a 3-4 week reconditioning program to build upper body strength and endurance prior to starting a job.

By June, Wilcox had finished her therapy and on June 19, 2002, she returned to see Dr. Miller for an independent medical evaluation. Dr. Miller concluded that Wilcox had a 9% impairment

in both her upper right and left extremities (Tr. 235). He agreed with the recommendation of the occupational therapist regarding work, saying that Wilcox needed to be in a light duty job that would not require repetitive work with her hands.

## C. **Wilcox's Testimony**

At the January 22, 2003 hearing, Wilcox testified that the pain she experienced from both her left and right hands made it more difficult to do chores around the house such as vacuuming, washing dishes, dusting, doing laundry, cooking, dressing, and showering (Tr. 24-25). Wilcox also testified that since she was not employed, she would spend the rest of her day napping, watching television, receiving visitors, or driving to visit others (Tr. 27-28). When asked by her attorney if she had difficulty concentrating, she replied "yes," that her persistent pain made it difficult for her to concentrate, having been "so cooped up." (Tr. 29.) Wilcox also responded "yes" when her attorney asked her if she had trouble sleeping at night as a result of her pain (Tr. 29). Wilcox claimed that she would have trouble sleeping as much as three times per month and, as a result, some housework would take three to four times longer to do, while other housework would remain unfinished.

Wilcox further testified that she took naps between 3-5 days per week for an average of three hours (Tr. 33). Lastly, Wilcox testified that she believed she was incapable of holding any job because of her constant pain. She also testified that the pain medication she took dulled the pain but did not make it go away[3] (Tr. 31, 35).

D. **Testimony of VE**

Howard Steinberg testified as a VE. The ALJ inquired of Steinberg if a woman of Wilcox's age, education, and work experience, who had a functional capacity for sedentary work, but had limited use of both upper extremities reaching in all directions, handling, gross manipulation, fingering, fine manipulation, and feeling, who needed to avoid working around machinery and vibrating equipment, working at heights, and frequent prolonged upper extremity grasping and lifting, could perform any of her past relevant jobs (Tr. 38-39). Steinberg responded that a person such as Wilcox would not be able to perform any of her past jobs, but could work as a surveillance

---

[3] At the time of the administrative hearing, Wilcox was taking 800 Mg. tablets of Ibuprofen and 30 Mg. tablets of Tylenol with Codeine (Tr. 31).

system monitor, of which 87,000 jobs existed in the national economy and 280 could be found within the state (Tr. 39). When Wilcox's attorney questioned Steinberg, he asked whether someone who took naps 3-5 hours per day, 10 to 15 times per month could perform the job of surveillance system monitor. Id. To this question, Steinberg responded that with the further limitation proposed by Wilcox's attorney, one could not hold the job of surveillance system monitor and that there existed no unskilled jobs in the national economy that fit all of the functional limitations posited (Tr. 42). Steinberg also testified that if someone lacked the ability to concentrate in addition to the other limiting factors specified by the ALJ, the job of surveillance system monitor would be "close to impossible." (Tr. 43.)

## E. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process established by the SSA in rendering his decision of April 23, 2003. First, the ALJ found that Wilcox had not performed substantial gainful work since December 20, 2000, the date of the alleged onset of her disability (Tr. 14). At step two, the ALJ determined that Wilcox's impairment was severe within the meaning

of the regulations.  But, at step three, since Wilcox's impairment was "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4," the ALJ was required to continue the inquiry.  Id.  At the fourth step of the sequential evaluation process, the ALJ determined, based on Steinberg's testimony, that Wilcox could not return to any prior employment because her functional work capacity was no longer light duty work, but sedentary (Tr. 16). Finally, at step five, the ALJ determined that other jobs exist in significant numbers in the national economy that could accommodate Wilcox's residual functional capacity ("RFC") and her specific vocational limitations.

As evidence of Wilcox's ability to work, the ALJ cited the medical examinations of Dr. Miller and the occupational therapist, Joyce Sylvester.  Dr. Miller's most recent exam suggested that Wilcox had no swelling or discoloration in either the right wrist or the left wrist (Tr. 15).  He also determined that Wilcox was able to dorsiflex about 75 degrees and palmer flex 70 degrees.  Id.  Although Wilcox had some decreased sensation to a pinprick on some of her right fingers, there was no pain or atrophy.  Id.  Dr. Miller concluded that Wilcox could

expect to have long-term problems and chronic pain in both wrists, but that she could perform light duty work that did not involve repetitive activities. Id.

Sylvester's examination determined that Wilcox had the ability to lift and carry 12 pounds with her left arm and 9 pounds with her right. Although Sylvester also found pain to be a chronic problem for Wilcox, she stated that Wilcox still maintained an RFC and that Wilcox could learn to manage her pain through the use of rest, avoidance, and pacing. Id.

The ALJ determined that despite Wilcox's complaints of chronic pain, her allegation that she could not perform any work was not persuasive. Id. He found that Wilcox retained the following RFC:

> [A]n ability to lift and carry less than ten pounds on a regular and occasional basis. Further, the claimant can sit, stand and walk without limitation. Ms. Wilcox can push and pull up to twenty pounds on an occasional basis. She should never crawl and she should avoid heights, ropes and scaffolding. The claimant's ability to reach, handle and finger are limited as well to an occasional basis only. Finally, Ms. Wilcox should avoid vibrating machinery and equipment and repetitive actions.

Id. Accordingly, the ALJ concluded that Wilcox retained the capacity for work that exists in substantial numbers in the

-11-

national economy and that she did not qualify for a "disability" as defined by the Social Security Act.

## II.  **STANDARD OF REVIEW**

Under the Social Security Act, the factual findings of the ALJ are conclusive if supported by "substantial evidence."  42 U.S.C. § 405(g); see also Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  I must uphold the ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion."  Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ's decision is therefore supported by substantial evidence if, given all the evidence, it is reasonable.  It is also the function of the ALJ, and not the courts, to determine issues of credibility, to draw inferences from the record evidence, and to resolve conflicts in the evidence.  Ortiz, 955 F.2d at 769.

The ALJ's findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the Commissioner, through the

ALJ, has misapplied the law or failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). I apply these standards to the arguments Wilcox raises in her appeal.

### III. <u>ANALYSIS</u>

Wilcox argues that the ALJ's ruling failed to identify, inquire into, or resolve differences between the VE's testimony and the definition in the DOT. Wilcox also argues the ALJ failed to properly consider her subjective complaints of pain which further restricted her RFC. For the reasons set forth below I reject Wilcox's claims and affirm the decision of the ALJ.

### I. <u>Duty to Inquire about Potential Variance</u>

Wilcox does not dispute the ALJ's objective determination of her RFC, but rather points to a potential variance in the job description of a surveillance system monitor as described by the VE from the description of the job provided by the DOT. Wilcox contends that the ALJ erred by not inquiring of the VE whether the job description he provided was consistent with that in the

DOT.  The SSA has issued a policy interpretation ruling, which requires the adjudicator to ask about any possible conflict between the VE's evidence and information provided in the DOT. S.S.R. 00-4p, 2000 WL 1898704 at *4.  The mere failure to ask such a question, however, cannot require remand on its own. Hogdson v. Barnhart, No. 03-185-B-W, 2004 WL 1529264, at *2 (D. Me. June 24, 2004).  "Such an exercise would be an empty one if the VE's testimony were in fact consistent with the DOT."  Id.  I find this logic persuasive.  The ALJ in this case asked what the source of the VE's testimony was concerning the job description of surveillance system monitor, and the VE cited the DOT.  Thus, the ALJ would have no cause to believe a discrepancy existed where the VE identified the source of his information as the DOT.

Moreover, I do not agree with Wilcox's assertion that there are discrepancies between the VE's testimony and the DOT.  First, Wilcox asserts that the DOT identifies surveillance system monitor as a "government service" job, which conflicts with the VE's testimony describing a private sector job.  A more close examination, however, reveals that the DOT's industry designation shows "in what industries the occupation was studied but does not mean that it may not be found in others."  Dictionary of

-14-

Occupational Titles, XXI (4th ed., rev. Vol. I 1991).

"Therefore, industry designations are to be regarded as indicative of industrial location, but not necessarily restrictive." Id.

Wilcox points to a second "difference" between the VE's testimony and the DOT. The VE did not specifically describe the additional functions of adjusting monitor controls and pushing a hold button to maintain surveillance where an incident is developing, which are identified in the DOT job description. These items, however, are not material. The VE testified that a person with an RFC of sedentary and unskilled could perform the job of surveillance system monitor with "limited use of hands." (Tr. 40.) This description conforms to Wilcox's RFC as identified by Dr. Miller and Wilcox's occupational therapist. Where the ALJ found Wilcox to have the ability to reach, handle, and finger somewhere between a limited and occasional basis, the job of surveillance system monitor matches the ALJ's determination of Wilcox's ability level. I am not persuaded either that the VE neglected minor aspects of the job description or that the alleged inconsistencies are material to the analysis.

## II.  Credibility of Wilcox's Complaints of Pain

I am also not persuaded by Wilcox's second argument that the ALJ failed to consider the effect of her subjective complaints of pain on her ability to effectuate the job of surveillance system monitor.  In determining the credibility of a person's statements, an adjudicator must consider the entire record, which includes the objective medical evidence, the individual's subjective statements about symptoms, information provided by medical specialists, and any other relevant evidence in the record.  S.S.R. 96-7p, 1996 WL 374186 at *1, see also Avery v. Sec'y of Health & Human Servs. 797 F.2d 19 (1st Cir. 1986).  So long as a credibility determination is supported by the evidence, the ALJ's determination is entitled to deference since he observed the claimant, evaluated the claimant's demeanor, and considered how her testimony corresponded with the rest of the evidence.  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

The ALJ did in fact consider Wilcox's testimony concerning her physical limitations and pain allegations.  But despite her claims of inability to perform any work because of her pain, the ALJ found that Wilcox retained a sedentary work capacity.  The

-16-

ALJ concluded, based on substantial evidence in the record, including the medical opinions of Dr. Miller and the occupational therapist, that Wilcox's claim of pain was not so severe as to preclude all work.

Dr. Miller's examination from June 2002 found that Wilcox is "expected to have long term problems with both wrists and with chronic pain," but that she "is able to perform light duty work that does not involve repetitive activities." (Tr. 15.) Moreover, Wilcox's physical therapist, Joyce Sylvester, found that "pain was an overall factor in the claimant's ability to perform activities," but that she "retains a RFC." Id. As such, I find that the ALJ adequately considered the various factors concerning Wilcox's condition and reached a determination of her RFC that is supportable in the record.

## IV. CONCLUSION

Since I have determined that the ALJ's denial of Wilcox's benefits was supported by substantial evidence, I affirm the Commissioner's decision. Accordingly, Wilcox's Motion to Reverse (Doc. no. 8) is denied, and Defendant's Motion for an

Order Affirming the Decision of the Commissioner (Doc. no. 9) is

granted.  The clerk shall enter judgment accordingly.

SO ORDERED.


_____
Paul Barbadoro
Chief Judge


July 28, 2004

cc:  Jeffry A. Schapira, Esq.
     David L. Broderick, Esq.